Mark C. Holscher (SBN 139582)
mark.holscher@kirkland.com
Jeff Sinek (SBN 135508)
jeff.sinek@kirkland.com
James Rapore (SBN 278925)
james.rapore@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

David Klein (SBN 273925)
david.klein@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900

*Attorneys for Defendant Eric Pulier*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ERIC PULIER,<br><br>Defendant. | **CASE NO. 17-CV-07124-PSG-RAO**<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: June 22, 2020<br>Time: 1:30 p.m.<br>Courtroom: 6A |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 22, 2020, at 1:30 p.m., or as soon thereafter as the Court is available, in Courtroom 6A of the above-entitled Court, located at 350 West 1st Street, Los Angeles, California 90012, Defendant Eric Pulier ("Pulier") will move the Court for partial summary judgment. Each count of the Securities and Exchange Commission's ("SEC") complaint against Pulier is based upon the alleged formation of a bribery scheme in connection with the 2013 acquisition of ServiceMesh Inc. Pulier moves for partial summary judgment on his affirmative defense of estoppel. Pulier seeks such relief on the grounds that judicial estoppel prohibits the SEC from advancing a factual theory concerning the formation of the alleged bribery scheme in this case that is clearly inconsistent with the factual theory the SEC alleged and prevailed on in a previous related lawsuit concerning the same bribery scheme: *Securities and Exchange Commission v. Keith Hunter*, No. 16-cv-7246 (C.D. Cal. Sept. 27, 2016). In the alternative, Pulier moves for partial summary judgment on each count of the SEC's complaint on the grounds that judicial estoppel prohibits the SEC from advancing a factual theory in support of each count of its complaint concerning the formation of the bribery scheme that is clearly inconsistent with the factual theory it advanced in the previous related lawsuit. Pulier seeks an order precluding the SEC from pursuing the factual theory concerning the formation of the bribery scheme it is advancing in this litigation.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, Pulier's Statement of Uncontroverted Material Facts and Conclusions of Law, Pulier's Request for Judicial Notice, the Declaration of James Rapore, the Declaration of Mark Holscher, the Declaration of Eric Pulier, the Appendix of Exhibits, such additional briefing as the Court may request or the Rules of Court allow, and the evidence and arguments that will be presented to the Court at the hearing of this motion.

Pulier's motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on Wednesday, March 25, 2020.

DATED: April 28, 2020

Kirkland & Ellis LLP

By: */s/ James Rapore*
James Rapore

*Attorneys for Defendant Eric Pulier*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**TABLE OF CONTENTS**

**INTRODUCTION** ........ **1**

**BACKGROUND** ........ **5**

A. CSC's Acquisition of ServiceMesh. ........ 5

B. Payments to Hunter and Waldron. ........ 6

C. Hunter Is Investigated but Maintains His Innocence. ........ 6

D. Hunter Provides a Different Story to the SEC. ........ 7

E. The SEC Files a Complaint Against Hunter That Adopts His Story. ........ 8

F. Before Filing Its Complaint Against Hunter, the SEC Was Aware of Compelling Evidence Undermining Hunter's Story. ........ 9

G. Pulier Informs the SEC He Will Vigorously Contest the SEC's Theory Concerning the Formation of the Bribery Scheme. ........ 12

H. The SEC Changes Its Factual Theory When It Sues Pulier in 2017. ........ 13

**ARGUMENT** ........ **14**

A. Summary Judgment Standard. ........ 14

B. The SEC Should Be Judicially Estopped from Changing Its Factual Theory About the Bribery Scheme That Forms the Basis of Its Case. ........ 16

1. The SEC's Current Factual Theory Is Clearly Inconsistent with the Factual Theory It Alleged Against Hunter. ........ 17

2. The SEC Persuaded a Court to Accept Its Prior Factual Theory, Creating the Perception that a Court Was Misled. ........ 18

3. Allowing the SEC to Change Its Factual Theory Would Give the SEC an Unfair Advantage in This Litigation and Impose an Unfair Detriment. ........ 20

4. Judicial Estoppel Is Particularly Appropriate Here, Where the SEC Knew of the Problems with Hunter's Story Before Suing Hunter. ........ 22

**CONCLUSION** ........ **24**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank One Tr. Co. v. Cty. of Iosco*,
597 F. Supp. 586 (E.D. Mich. 1984) ........ 15

*Baughman v. Walt Disney World Co.*,
685 F.3d 1131 (9th Cir. 2012) ........ 17, 18, 19, 20

*Baughman v. Walt Disney World Co.*,
691 F. Supp. 2d 1092 (C.D. Cal. 2010) ........ 19

*Cont'l Illinois Corp. v. Comm'r*,
998 F.2d 513 (7th Cir. 1993) ........ 21

*Ford v. Marion Cty. Sheriff's Office*,
942 F.3d 839 (7th Cir. 2019) ........ 14

*Fort Hall Landowners All., Inc. v. Bureau of Indian Affairs*,
407 F. Supp. 2d 1220 (D. Idaho 2006) ........ 15

*Gagne v. Zodiac Mar. Agencies, Ltd.*,
274 F. Supp. 2d 1144 (S.D. Cal. 2003) ........ 22

*Hamilton v. State Farm Fire & Cas. Co.*,
270 F.3d 778 (9th Cir. 2001) ........ 22

*In re Reserve Fund Sec. & Derivative Litig.*,
2013 WL 5432334 (S.D.N.Y. Sept. 30, 2013) ........ 18

*Kenney v. Scripps Howard Broad. Co.*,
259 F.3d 922 (8th Cir. 2001) ........ 15

*Latta v. Sec. & Exch. Comm'n*,
356 F.2d 103 (9th Cir. 1965) ........ 15

*McDaniel v. IntegraCare Holdings, Inc.*,
901 F. Supp. 2d 863 (N.D. Tex. 2012) ........ 15

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
682 F.3d 1144 (9th Cir. 2012) ........ 14

*New Hampshire v. Maine*,
532 U.S. 742 (2001)....1, 4, 15, 16

*Ortega v. Cty. of Los Angeles*,
2019 WL 2902872 (C.D. Cal. Apr. 1, 2019)....15

*Regence Grp. v. TIG Specialty Ins. Co.*,
903 F. Supp. 2d 1152 (D. Or. 2012)....15

*Rissetto v. Plumbers & Steamfitters Local 343*,
94 F.3d 597 (9th Cir. 1996)....16, 18, 20

*Russell v. Rolfs*,
893 F.2d 1033 (9th Cir. 1990)....16

*Sconiers v. First Unum Life Ins. Co.*,
830 F. Supp. 2d 772 (N.D. Cal. 2011)....15

*Turf Paradise, Inc. v. Arizona Downs*,
670 F.2d 813 (9th Cir. 1982)....15

*United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*,
555 F.3d 772 (9th Cir. 2009)....18

*United States v. Gilbert*,
920 F.2d 878 (11th Cir. 1991)....15

*United States v. Liquidators of European Fed. Credit Bank*,
630 F.3d 1139 (9th Cir. 2011)....4, 16, 17, 18

*Wade v. Woodings-Verona Tool Works, Inc.*,
469 F. Supp. 465 (W.D. Pa. 1979)....15

**Rules**

Fed. R. Civ. P. 45....9

Fed. R. Civ. P. 56(a)....14, 15

## INTRODUCTION

To protect the integrity of the judicial process, the doctrine of judicial estoppel prevents a party from taking contradictory positions in litigation. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). A party may not assert one position to prevail in a case and then assert an inconsistent position to prevail in another case. *Id*. Judicial estoppel prohibits a party "from deliberately changing positions according to the exigencies of the moment." *Id.* at 749–50. The SEC, however, has done exactly what is not allowed under judicial estoppel. Its central allegation against Eric Pulier in this case directly contradicts the central factual theory it alleged to prevail in a previous related case concerning the same alleged bribery scheme.

The SEC filed two actions that allege Pulier, Keith Hunter, and others engaged in a bribery scheme. In these two actions, the SEC asserted dramatically inconsistent positions about the formation of the alleged bribery scheme, including contradictory positions on the fundamental issues of ***when*** and ***how*** the bribery scheme formed.

The alleged bribery scheme relates to the 2013 acquisition of ServiceMesh Inc. ("ServiceMesh") by Computer Sciences Corporation ("CSC"). Defendant Pulier co-founded ServiceMesh and was its CEO and largest individual shareholder at the time of the acquisition. The final terms of the acquisition agreement included an "earnout" provision. This provision provided a formula under which CSC would pay ServiceMesh shareholders additional compensation (the "earnout") based upon the amount of revenue ServiceMesh generated within a specified period of time.

In 2015, the SEC and the United States Attorney's Office ("USAO") began investigating allegations that Pulier bribed Hunter, who was an employee of the Commonwealth Bank of Australia ("CBA"), and other CBA employees to get CBA to enter contracts with his company to increase the earnout CSC paid ServiceMesh shareholders. Hunter eventually decided to cooperate with the government and was jointly interviewed by the SEC and the USAO in Australia on December 16, 2015.

On September 27, 2016, the SEC filed its first lawsuit against Hunter based on

what Hunter told the SEC. In its complaint against Hunter, the SEC alleged that Hunter learned in September 2013 that the ServiceMesh acquisition included an earnout provision. The SEC further alleged that later in September 2013, Hunter and another CBA employee traveled from Australia to Santa Monica to meet with Pulier in ServiceMesh's office. At this meeting, the SEC alleged that Hunter, Pulier, and the other CBA employee agreed to a scheme in which Pulier would pay the CBA employees to award contracts to Pulier's company to increase the earnout payment.

On the same day the SEC filed its complaint, the USAO filed a criminal information against Hunter and, two days later, filed a plea agreement Hunter signed. In the plea agreement, Hunter admitted to the same allegations concerning the formation of a bribery scheme to increase the earnout at the September 2013 meeting in Santa Monica, as the SEC alleged in its complaint. The SEC and the USAO coordinated their filings together, even agreeing to avoid filing on September 26, because a presidential debate that day would "drown out" news coverage.

Before filing its complaint based on Hunter's story, the SEC possessed ample information establishing no earnout existed in September 2013, making it impossible for a bribery scheme concerning the earnout to have formed at a September meeting. The SEC possessed contemporaneous negotiation documents exchanged between CSC and ServiceMesh and interviewed witnesses involved in the negotiations, which established that as of September 2013, CSC's proposed acquisition was for a fixed price of $335 million with no earnout provision. CSC first proposed that the deal include an earnout in October 2013, well after Hunter returned to Australia.

Notwithstanding this information, the SEC filed a complaint based on Hunter's story, thus readily obtaining Hunter's consent to a judgment against him. Hunter's Consent for Final Judgment was filed on the same day the SEC filed its complaint against him. Further, the USAO planned to use Hunter as a cooperator in a future criminal proceeding against Pulier. By adopting Hunter's story in its complaint, the SEC avoided filing a public document that contradicted the USAO's key cooperator,

who was, and remains, the only witness claiming that Pulier offered a bribe.

Hunter's Consent required Hunter to acknowledge his written plea agreement admitting the SEC's false factual allegations, to voluntarily appear for interviews at the SEC's request, to accept service of SEC subpoenas in other cases, and to pay $630,000 in disgorgement, among other things. The court accepted Hunter's stipulation, and entered a final judgment in favor of the SEC based on its complaint against Hunter.

After the SEC secured a final judgment against Hunter, Pulier's counsel met with the SEC. Using documents the SEC itself possessed before filing the Hunter complaint, Pulier's counsel gave the SEC a presentation showing how the deal documents and related emails established that the SEC's earnout bribery theory was fundamentally flawed. Pulier informed the SEC that he would defend against the SEC's case by establishing it was impossible for Hunter to have learned of an earnout in September 2013 and for Pulier to have offered bribes to increase the earnout at a meeting in Santa Monica in September 2013, because no earnout existed at that time.

In spite of this, the SEC filed its complaint against Pulier on September 27, 2017. Well aware that Pulier would challenge the factual theory of an earnout bribery scheme being formed in September 2013, the SEC excluded from the Pulier complaint all of the allegations it made in the Hunter complaint about the bribery scheme being formed in September. The SEC deleted any reference to a meeting in September in Santa Monica, Hunter's awareness before this meeting that the acquisition included an earnout, and an agreement being reached at the September meeting to maximize the earnout. Instead, the SEC only made a vague, single-sentence allegation that "[i]n late 2013, Pulier offered to pay bribes to Hunter . . . ." On the same day that the SEC filed its complaint against Pulier, the USAO indicted Pulier. Since the criminal case would proceed first, the SEC undoubtedly expected that it could ride the coattails of a criminal conviction and thus never have to provide any specific information about when, how, or where the bribery scheme was formed. Indeed, the SEC agreed to a

request by the USAO to stay this case until the criminal case concluded. However, the USAO dismissed its indictment against Pulier with prejudice in the interests of justice in December 2018. The SEC was then faced with the prospect of explaining how the alleged bribery scheme actually formed.

When Pulier propounded discovery asking how the alleged bribery scheme formed, the SEC did what the Supreme Court has expressly held it may not do. It "deliberately chang[ed] [its] positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750. The SEC jettisoned the position it took in the Hunter case of how and when the alleged bribery scheme formed. The SEC no longer takes the position that Pulier offered bribes to inflate the earnout at the September meeting in Santa Monica. Instead, it now takes the position that Pulier offered the bribes during phone calls that began in late-October 2013 ***after*** an earnout was added to the deal. This new factual theory directly contradicts the factual theory the SEC used in its case against Hunter. The doctrine of judicial estoppel prohibits such practices. Judicial estoppel does not allow the SEC to change its factual position to attempt to prevail in this case.

Judicial estoppel is designed to prevent parties from playing fast and loose with the legal system. Courts apply judicial estoppel when: (1) the party's current position is inconsistent with its previous position; (2) the party convinced a court to accept the previous position; and (3) not applying judicial estoppel would allow the party to gain an unfair advantage or impose an unfair detriment. *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1148 (9th Cir. 2011).

There is no genuine dispute of material fact that all of these factors are satisfied. The SEC's current position that Pulier offered the bribes over the phone in late-October 2013 is inconsistent with the position it advanced against Hunter—that the bribes were offered in September 2013 at an in-person meeting in Santa Monica. The SEC persuaded a court to accept its earlier position when the court accepted Hunter's consent and entered final judgment for the SEC. Finally, not applying judicial

estoppel would allow the SEC to abandon a case it would have tremendous difficulty proving against Pulier. It would allow the SEC to seek to prevail in two cases concerning the same bribery scheme with dramatically inconsistent positions. This would confer an unfair advantage on the SEC.

The SEC's change of position does not concern a technical or insignificant issue. It concerns the central issue of this litigation: the formation of the alleged bribery scheme that is the foundation of each count in the SEC's complaint. If the SEC is allowed to proceed on the factual theory it seeks to advance in this litigation, it could achieve two judgments concerning the same bribery scheme that are based on contradictory factual theories. One court will necessarily have entered judgment based on a false factual theory. Judicial estoppel exists to prevent such manipulation of the judicial system.

Pulier respectfully requests that the Court judicially estop the SEC from advancing its current factual theory concerning the formation of the alleged bribery scheme because it is inconsistent with the allegations in the SEC's original lawsuit against Keith Hunter.

## BACKGROUND

### A. CSC's Acquisition of ServiceMesh.

In 2013, CSC sought to acquire ServiceMesh, a company that provides enterprise cloud-based applications and platforms. SUF No. 1.[1] Pulier co-founded ServiceMesh and was its CEO. Declaration of Eric Pulier ("Pulier Decl.") ¶ 2. On September 9, 2013, CSC sent ServiceMesh a term sheet proposing to acquire ServiceMesh for a fixed price of $335 million. SUF No. 2. The initial term sheet did not contain an earnout clause. SUF No. 3. Almost a month later, on October 4, 2013, CSC sent ServiceMesh a draft merger agreement. SUF No. 4. Consistent with the term sheet, the October 4 agreement proposed a fixed purchase price of $335 million.

[1] Citations to pages of exhibits refer to the page numbers at the bottom center of each page, which were added prior to filing.

SUF No. 5. There was no reference to an earnout. *Id.*

On October 16, 2013, CSC provided ServiceMesh with a new term sheet that for the first time added an earnout provision to the deal terms. SUF No. 6. Under these new terms, CSC would withhold approximately $135 million of the purchase price, and only pay this sum if ServiceMesh generated a certain amount of revenue before January 31, 2014. Declaration of James Rapore ("Rapore Decl.") Ex. 4 at 6–9. On October 21, 2013, ServiceMesh received an updated agreement, now styled as an Equity Purchase Agreement ("EPA"), incorporating an earnout provision. SUF No. 7. On October 29, 2013 CSC and ServiceMesh signed the EPA, which contained an earnout provision. SUF No. 8. Under the terms of the final earnout provision, ServiceMesh shareholders would receive a multiple of approximately $10 for every dollar of revenue over $20 million that ServiceMesh generated from January 1, 2013 to January 31, 2014 (the "Earnout Period"). SUF No. 9. The earnout payment could not exceed the amount withheld from the initial purchase price for ServiceMesh, which was $137,014,548 in the final draft of the agreement. Rapore Decl. Ex. 7 at 2–3, 6–7.

During the Earnout Period, ServiceMesh executed contracts with various customers, including CBA, a long-time client. Rapore Decl. Ex. 1 at 6–8. Based on the revenue booked during the Earnout Period, ServiceMesh shareholders received an earnout of $98,034,058. Rapore Decl. Ex. 1 at 9.

**B. Payments to Hunter and Waldron.**

In 2014, after the Earnout Period ended, Pulier provided funding to establish a philanthropic venture called Ace to develop and use technology to address social issues. Rapore Decl. Ex. 8 at 9, 23–24. Ace engaged CBA employees Keith Hunter and Jon Waldron as consultants. *Id.* Ex. 8 at 10–11. Over the course of 2014, Ace paid Hunter and Waldron, as well as other consultants.

**C. Hunter Is Investigated But Maintains His Innocence.**

In late 2014, CBA learned of Ace's payments to Hunter and Waldron because

virtually all of those payments were openly deposited into their CBA bank accounts. Rapore Decl. Ex. 8 at 10. At the end of December 2014, after discovering the payments, CBA terminated Hunter and Waldron. *See id*. Ex. 1 at 11. Hunter drafted a detailed, 28-paragraph statement explaining that the Ace payments were not bribes but advances on legitimate consulting work he was to perform for Ace. SUF No. 10.

**D. Hunter Provides a Different Story to the SEC.**

In 2015, the SEC, together with the USAO, commenced an investigation into allegations that Pulier paid bribes to Hunter and Waldron to increase the earnout payment CSC made to ServiceMesh shareholders. SUF No. 11. Law enforcement in Australia also criminally charged Hunter in March 2015. Rapore Decl. Ex. 1 at 4. In response to these investigations, in late 2015, Hunter decided to cooperate to seek leniency. *Id.* Ex. 8 at 12–14; *see id.* Ex. 12 at 3–5.

To do so, Hunter changed his story. On December 16, 2015, the USAO, the FBI and the SEC interviewed Hunter in Australia. SUF No. 12. Attorney Catherine Brilliant represented the SEC at this interview. SUF No. 13. During the interview, Hunter told the SEC that, before CSC acquired ServiceMesh, he met with CBA's Chief Information Officer, Michael Harte, in Harte's office in Australia. SUF No. 14. According to Hunter, Harte informed Hunter at this meeting that the acquisition included an "earn-out incentive," whereby ServiceMesh shareholders would receive more compensation for additional revenue ServiceMesh generated. SUF No. 15. (internal citations omitted). Harte allegedly told Hunter that Pulier "devised a formula" to pay Hunter and Harte for assisting ServiceMesh in generating additional revenue and increasing the earnout. SUF No. 16. Hunter claimed Harte drew a chart detailing how such a payout could work. SUF No. 17. Hunter also claimed that "[s]hortly after the meeting with Harte," Hunter and Waldron traveled to Santa Monica to meet with Pulier. SUF No. 18. According to Hunter, at this meeting "Pulier discussed the payout Hunter, Waldron and Harte could receive from Pulier" for helping ServiceMesh increase the earnout. SUF No. 19. After "leaving the

meeting, Hunter was under the impression that Hunter, Waldron and Harte would receive the same . . . payout from Pulier for their assistance with helping [ServiceMesh] achieve the 'earn-out'." SUF No. 20. Altogether, during his December 2015 interview Hunter mentioned the earnout at least ***57 times***. Rapore Decl. Ex. 8 at 15.

**E. The SEC Files a Complaint Against Hunter That Adopts His Story.**

On September 27, 2016, the SEC filed a complaint against Hunter that adopted the statements at his interview. SUF Nos. 21 & 22. The SEC alleged that "Hunter learned ***in September 2013*** that CSC planned to acquire [ServiceMesh], and understood that the terms would include an earn-out clause pursuant to which [ServiceMesh] shareholders could receive an additional payment based on [ServiceMesh's] software revenue generated through the end of January 2014." SUF No. 23 (emphasis added). The complaint further alleged that "[l]ater ***in September 2013***, Hunter traveled with another CBA executive to [ServiceMesh's] Santa Monica office for ***in-person meetings***." SUF No. 24 (emphasis added). "During one of the meetings attended by Hunter, [Pulier], and others, [Pulier] offered to pay a kickback to Hunter and two of his CBA colleagues in return for helping [ServiceMesh] shareholders maximize their Earn-out Payment from CSC." SUF No. 25. "Hunter and at least one other CBA employee agreed to help [Pulier] generate revenue for [ServiceMesh] through sales to CBA in exchange for the offered kickback." SUF No. 26.

On the same day the SEC sued Hunter, the USAO filed a criminal information against Hunter and, two days later, filed a plea agreement that Hunter signed. SUF Nos. 27 & 28. In the plea agreement, Hunter admitted to the same allegations about the formation of a bribery conspiracy at the September meeting as alleged in the SEC's complaint against Hunter. SUF No. 29. The SEC and the USAO coordinated their filings together, even agreeing to avoid filing on September 26, because a presidential debate that day would "drown out" news coverage. SUF No. 30.

The same day the SEC sued Hunter, the SEC filed a Consent for Final Judgment that Hunter signed. SUF No. 31. This Consent required Hunter to agree to all of the SEC's requested relief, including disgorgement of $630,000. SUF No. 32. Hunter also agreed to:

- Acknowledge his written plea agreement admitting to conduct alleged in the complaint. SUF No. 33.
- Not contest the factual allegations in the SEC's complaint. SUF No. 34.
- Not take "any action or make or permit to be made any public statement denying" the allegations in the complaint, or "creating the impression" the complaint lacked a factual basis. SUF No. 35.
- Be interviewed by the SEC for an unlimited period of time, at the time and place of the SEC's choosing. SUF No. 36.
- Accept service of notices and subpoenas from the SEC and waive the territorial limits of Federal Rule of Civil Procedure 45. SUF No. 37.
- Consent to personal jurisdiction in any U.S. District Court. SUF No. 38.

In exchange, the SEC agreed to resolve the claims it had asserted against Hunter. SUF No. 39. The district court accepted the stipulation, entered final judgment based on the allegations in the SEC's complaint, and granted the SEC all the relief requested in its complaint. SUF Nos. 40 & 41.

### F. Before Filing Its Complaint Against Hunter, the SEC Was Aware of Compelling Evidence Undermining Hunter's Story.

As part of its investigation, the SEC received 15 volumes of documents from CSC in 2015, well before suing Hunter. SUF No. 42. In total, as of September 5, 2016, CSC had produced a bates number range of documents of CSC00000001 to CSC00958635, which included the following documents:

- The September 9, 2013 term sheet proposing to acquire ServiceMesh for a fixed price of $335 million with no earnout. SUF Nos. 43 & 44.
- A September 25, 2013 draft email to be sent from ServiceMesh to CSC

summarizing the compensation for the deal as a fixed price of $335 million ***with no mention of an earnout***. SUF Nos. 43 & 45.

- The October 4, 2013 draft merger agreement from CSC, which contained ***no earnout provision*** and proposed a sale for a fixed price of $335 million. SUF Nos. 43 & 46.
- The October 16, 2013 CSC term sheet CSC sent to ServiceMesh containing an earnout provision. SUF Nos. 43 & 47.
- The October 21, 2013 draft EPA containing an earnout provision. SUF Nos. 43 & 48.
- The signed and executed October 29, 2013 EPA containing an earnout provision. SUF Nos. 43 & 49.

These documents demonstrate that no earnout existed in September 2013, when Hunter and the SEC allege the bribery scheme was formed. To the contrary, they show that the earnout was not part of the proposed acquisition until October 2013.

In addition to possessing documents showing there was no earnout in September 2013, multiple witnesses told the SEC before it sued Hunter that no earnout existed in September 2013. The SEC interviewed CSC's chief financial officer Paul Saleh on July 14, 2016. SUF No. 50. During the interview, Saleh was shown the September 2013 term sheet for the ServiceMesh transaction, which demonstrated that the deal in September was for a fixed price and contained no earnout.[2] SUF No. 51. Saleh confirmed the earnout was added "later on." SUF No. 55.

On October 8, 2015, the SEC interviewed Jeff Drake, an Executive Vice President of ServiceMesh who was a primary deal negotiator for ServiceMesh. SUF No. 56. Drake confirmed Saleh's statement that the September 2013 term sheet did

---

[2] Before the Saleh interview, former Assistant United States Attorney Stephen Cazares emailed SEC attorney Catherine Brilliant the exhibits he "plan[ned] to show [Nelson] Eng." SUF No. 52. Attached as exhibit 3 to this email is a copy of the September 2013 term sheet. SUF No. 53. During Saleh's interview, Cazares showed him exhibit 3 from the Eng interview. SUF No. 54.

not involve an earnout, a provision added after CSC performed a substantial portion of its due diligence on ServiceMesh. SUF No. 57. Drake told the SEC that "[t]he initial offer was for $335 million all cash" and that "[a]s diligence progressed, [ServiceMesh] revenue was not coming together as the pipeline projected. As a result, CSC began to consider an earnout." SUF No. 58.

The SEC interviewed Nelson Eng, a primary deal negotiator for CSC, on November 12, 2015. SUF No. 59. Eng was shown a copy of the September 2013 term sheet, which he confirmed contained no earnout. SUF No. 60. After the September 2013 term sheet was created, Eng "spent a lot of time at the Fairmont Hotel in Santa Monica, conducting shuttle diplomacy between CSC's deal committee and [ServiceMesh's] management," and evaluating ServiceMesh's "revenue pipeline." SUF No. 61. Following CSC's investigation, "CSC management had legitimate questions about which deals in the pipeline would close." SUF No. 62. After walking away from negotiations and returning to the east coast, Eng and CSC's investment bankers crafted an earnout provision. SUF No. 63. CSC's deal committee initially rejected proposing an earnout to ServiceMesh, but eventually approved an earnout. SUF No. 64. After further negotiations, ServiceMesh agreed to the earnout.[3] SUF No. 65. Additionally, ServiceMesh CFO Teymour Boutros-Ghali told the SEC in his July 13, 2016 interview that the original September 2013 term sheet was an "all cash deal," with CSC adding the earnout at a later date "when CSC became concerned about [ServiceMesh's] sales forecasts." SUF Nos. 67, 68 & 69.

The SEC attorney who signed the Hunter complaint, Catherine Brilliant, attended these interviews. SUF No. 70. Ms. Brilliant prepared at least 13 versions of the Hunter complaint before filing it on September 27, 2016. SUF No. 71. Shortly before filing it, she received additional evidence that revealed serious difficulties with the facts ultimately alleged in the Hunter complaint. 22 days before filing the Hunter

[3] Before Eng's interview, SEC attorney Catherine Brilliant was emailed a copy of the October 16, 2013 term sheet in which CSC added an earnout to the deal terms. SUF No. 66.

complaint, counsel for CSC emailed Ms. Brilliant two internal ServiceMesh emails dated October 4, 2013 that strongly suggested that there was no earnout in September 2013. SUF No. 72. In these emails, Jeff Drake of ServiceMesh explained that while the current deal was for a fixed price of "$335m," he believed CSC might propose a structure where ServiceMesh would only get the full amount if it achieved certain "metrics." SUF No. 73. After speaking with CSC the same day, Drake confirmed that CSC's "[n]ext step" was to find an alternative deal structure with greater "flexibility" on how to distribute the purchase price. SUF No. 74.[4] CSC sent the October 16, 2013 term sheet containing an earnout provision to ServiceMesh several days later. SUF No. 6.

The SEC possessed ample evidence that showed there were serious reasons to doubt the truth of the central allegation in the Hunter complaint: that Pulier offered bribes to inflate the earnout at an in-person meeting in September 2013.

**G. Pulier Informs the SEC He Will Vigorously Contest the SEC's Theory Concerning the Formation of the Bribery Scheme.**

On November 3, 2016, Pulier's counsel made a presentation to the SEC detailing why the SEC should not bring an enforcement action against Pulier. SUF No. 75. Pulier's counsel argued that the SEC's theory of how the bribery scheme formed, as alleged in the Hunter complaint, was fundamentally flawed. SUF No. 76. It was impossible for Hunter to have learned that the deal contained an earnout in September 2013 and for Pulier to have offered bribes to inflate the earnout at a September 2013 meeting in Santa Monica because an earnout did not exist in September 2013. SUF No. 77. Pulier's counsel referenced documents the SEC possessed before it filed the Hunter complaint to show that the concept of an earnout

[4] Tellingly, the two emails CSC's counsel sent the SEC were marked with the following Bates numbers: CSC00958635 and CSC00958636. The fact that these key emails concerning the addition of the earnout were not included in the 958,634 pages CSC previously produced and were emailed to the SEC shortly before it filed the Hunter complaint strongly suggests that the SEC investigated and requested additional information concerning the timing of the earnout before it filed the Hunter complaint.

***did not exist in September***. SUF No. 78. At the time of the presentation, Pulier's counsel was unaware the SEC had interviewed multiple witnesses who had already confirmed the earnout did not exist in September. SUF No. 79.

**H. The SEC Changes Its Factual Theory When It Sues Pulier in 2017.**

Despite possessing overwhelming evidence undermining Hunter's narrative, the SEC filed a complaint against Pulier on September 27, 2017. SUF No. 80. Each cause of action is based on the same alleged bribery scheme in the Hunter complaint. SUF No. 81. Because Pulier had revealed he was aware of the issues with Hunter's story, the SEC could not make the same specific allegations regarding the September meeting it alleged in the Hunter complaint. So the SEC omitted those allegations from its complaint against Pulier. SUF No. 82. The SEC removed any reference to a September meeting in Santa Monica, any agreement being reached at this meeting to inflate the earnout, and Hunter's awareness of the earnout before this meeting. *Id*. Instead, the SEC vaguely alleged that Pulier offered bribes to Hunter and other CBA executives in "late 2013." SUF No. 83. The same day, the USAO filed an indictment against Pulier. SUF No. 84.

Initially, the SEC did not have to explain precisely ***when*** and ***how*** the alleged bribery scheme was formed because at the USAO's request, and with the SEC's consent, this Court stayed discovery pending the outcome of the criminal case against Pulier. *See* Rapore Decl. Ex. 31 at 2–3, Ex. 32 at 3. Unfortunately for the SEC, the USAO eventually dismissed its indictment with prejudice "in the interests of justice." SUF No. 85. The SEC was now unable to ride the coattails of the USAO's indictment to obtain a victory against Pulier without having to explain how, where or when the bribery scheme was formed.

When discovery resumed, Pulier propounded interrogatories asking how the alleged bribery scheme was formed. SUF No. 86. The SEC then asserted a new factual theory that contradicted the theory it took in its case against Hunter. The SEC no longer claims that Pulier offered the alleged bribes at an in-person meeting in

September 2013. Instead, it now claims that Pulier offered bribes on phone calls in late-October 2013 after the earnout was added to the deal.

Specifically, the SEC acknowledges, as it must, that the initial September 2013 term sheet contained no earnout and that "the terms of the deal were modified to . . . include an earnout" later "[a]s CSC conducted its due diligence." SUF No. 87. The SEC claims that on October 21, 2013 "Pulier received a revised draft of the equity purchase agreement, which included the earnout provision." SUF No. 88. The SEC now asserts that "[a]t or around the time the earnout provision became part of the transaction . . . Pulier offered to compensate Mr. Hunter, Jon Waldron, and Michael Harte." SUF No. 89. This interrogatory response makes no specific mention of the September 2013 in-person meeting it alleged in its case against Hunter. SUF No. 90. Instead, the SEC now contends, contrary to the position it took in the Hunter case, that "[a]round the time that Defendant Pulier received a revised draft of the equity purchase agreement with the earnout provision," Pulier had a series of calls with alleged bribery recipients who then provided Pulier with earnout contracts. SUF No. 91. The SEC therefore no longer claims that Pulier offered the bribes at the September 2013 in-person meeting in Santa Monica. Contrary to the position it took in the Hunter case, the SEC now claims Pulier offered bribes in a series of phone calls around October 21, 2013, when Pulier "received a revised draft of the equity purchase agreement with the earnout provision." Rapore Decl. Ex. 28 at 3, 12.

## ARGUMENT

### A. Summary Judgment Standard.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012). A motion for summary judgment may be "partial," that is, it may dispose of only one claim or defense, or merely part of a claim or defense. Fed. R. Civ. P. 56(a) (requiring the movant to identify the "part of each

claim or defense" on which summary judgment is sought); *see Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 849 (7th Cir. 2019) (affirming grant of partial summary judgment on some of plaintiff's claims); *Turf Paradise, Inc. v. Arizona Downs*, 670 F.2d 813, 816 (9th Cir. 1982) (same). This includes the defense of judicial estoppel. *See Regence Grp. v. TIG Specialty Ins. Co.*, 903 F. Supp. 2d 1152, 1169 (D. Or. 2012) (granting partial summary judgment on judicial estoppel); *Fort Hall Landowners All., Inc. v. Bureau of Indian Affairs*, 407 F. Supp. 2d 1220, 1225 (D. Idaho 2006) (granting motion for partial summary judgment to judicially estop federal government agency); *Wade v. Woodings-Verona Tool Works, Inc.*, 469 F. Supp. 465, 467 (W.D. Pa. 1979) (granting summary judgment on judicial estoppel).

Rule 56(a) allows courts to grant summary judgment based on an affirmative defense.[5] *See Kenney v. Scripps Howard Broad. Co.*, 259 F.3d 922, 924 (8th Cir. 2001) (granting summary judgment for defendant on a defamation claim based on a qualified privilege defense); *Bank One Tr. Co. v. Cty. of Iosco*, 597 F. Supp. 586, 587 (E.D. Mich. 1984) (granting summary judgment for defendant in tort claim based on affirmative defense of governmental immunity). Judicial estoppel can be raised as an affirmative defense. *See McDaniel v. IntegraCare Holdings, Inc.*, 901 F. Supp. 2d 863, 869–71 (N.D. Tex. 2012) (granting summary judgment based on the affirmative defense of judicial estoppel). Therefore the Court may grant Pulier's requested relief by granting partial summary judgment on his affirmative defense of estoppel.[6]

Courts also may grant partial summary judgment as to a particular factual theory underlying a claim. *See Ortega v. Cty. of Los Angeles*, 2019 WL 2902872, at *13 (C.D. Cal. Apr. 1, 2019) (granting partial summary judgment as to one factual

[5] Judicial estoppel is an equitable remedy. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). A court may grant equitable relief, such as an injunction, through a grant of summary judgment. *See United States v. Gilbert*, 920 F.2d 878, 881 (11th Cir. 1991) (affirming in part injunctive relief granted on summary judgment); *Latta v. Sec. & Exch. Comm'n*, 356 F.2d 103, 103 (9th Cir. 1965) (affirming injunctive relief granted on summary judgment).

[6] Pulier asserted the affirmative defense of estoppel in his Answer to the SEC's complaint. *See* Rapore Decl. Ex. 29 at 3.

theory supporting malicious prosecution claim but denying it as to the other factual theory); *Sconiers v. First Unum Life Ins. Co.*, 830 F. Supp. 2d 772, 773–74 (N.D. Cal. 2011) (granting partial summary judgment as to one factual theory supporting ERISA violation and denying it as to other factual theories). Therefore the Court may grant Pulier's requested relief by entering partial summary judgment on the SEC's factual theory concerning the formation of the bribery scheme, which forms the basis of each count in its complaint.

**B. The SEC Should Be Judicially Estopped from Changing Its Factual Theory About the Bribery Scheme That Forms the Basis of Its Case.**

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire*, 532 U.S. at 749 (internal citations omitted). Judicial estoppel also applies to contradictory representations made in different proceedings. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 605 (9th Cir. 1996); *see also New Hampshire*, 532 U.S. at 751–752 (judicially estopping New Hampshire from arguing position in 2000 lawsuit that contradicts position maintained in 1976 lawsuit). The doctrine "protect[s] the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749–50.[7]

Courts apply judicial estoppel when the following three factors are satisfied:

- First, whether the party's later position is "clearly inconsistent with its current position." *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1149 (9th Cir. 2011).
- Second, whether the party "convinced the court of that position," *id*. at 1148, creating the "perception that either the first or the second court was misled." *New Hampshire*, 532 U.S. at 750 (internal quotations omitted).

[7] As an equitable doctrine, judicial estoppel can be raised at any time and by a court *sua sponte*. *See Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990) (applying judicial estoppel when raised for first time on *habeas corpus* appeal).

- Third, whether not applying judicial estoppel "would allow the party to derive an unfair advantage or impose an unfair detriment on the opposing party." *Liquidators of European Fed. Credit Bank*, 630 F.3d at 1148 (internal citations and quotations omitted).[8]

As described below, each factor is satisfied. As a matter of law, Pulier is entitled to partial summary judgment on judicial estoppel grounds and the Court should prohibit the SEC from advancing its new position on when and how the bribery scheme was formed.

1. <u>The SEC's Current Factual Theory Is Clearly Inconsistent with the Factual Theory It Alleged Against Hunter.</u>

The factual theory the SEC now advances is clearly inconsistent with the factual theory it alleged against Hunter. In its case against Hunter, the SEC alleged that "Hunter learned in September 2013 that CSC planned to acquire [ServiceMesh], and understood that the terms would include an earn-out clause." SUF No. 23. The SEC further alleged that "[l]ater in September 2013, Hunter traveled with another CBA executive to [ServiceMesh's] Santa Monica office for in-person meetings." SUF No. 24. "During one of the meetings attended by Hunter, [Pulier], and others, [Pulier] offered to pay a kickback to Hunter and two of his CBA colleagues in return for helping [ServiceMesh] shareholders maximize their Earn-out Payment from CSC." SUF No. 25. The SEC alleged that at this meeting, "Hunter and at least one other CBA employee agreed to help [Pulier] generate revenue for [ServiceMesh] through sales to CBA in exchange for the offered kickback." SUF No. 26.

In its verified interrogatory responses, the SEC disavowed this position. It now claims that Pulier offered the bribes in a series of phone calls that began around October 21, 2013, after an earnout became part of the deal. SUF Nos. 88 & 89. This

---

8 A court may apply judicial estoppel even if only one factor is satisfied. *See Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012) (stating that the second factor "—that one of the courts has been misled—is often dispositive").

factual position directly contradicts the SEC's previous factual position that the bribes were offered at a September 2013 meeting in Santa Monica. These factual positions are clearly inconsistent. *See Liquidators of European Fed. Credit Bank*, 630 F.3d at 1148–1149 ("The government's 'original position' was that Liquidators could raise its legal challenges in the ancillary proceeding. Its 'later position' is that Liquidators cannot raise its legal challenges in the ancillary proceeding. Those are directly contradictory positions; necessarily, they are 'clearly inconsistent.'"); *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 779 (9th Cir. 2009) (directly inconsistent to take position that infringement started before insurance policy began and then argue it occurred only within policy period); *In re Reserve Fund Sec. & Derivative Litig.*, 2013 WL 5432334, at *18 (S.D.N.Y. Sept. 30, 2013) (applying judicial estoppel against the SEC because it was clearly inconsistent for SEC to argue entitlement to certain penalties where it successfully argued that discovery on that issue was not relevant).

2. <u>The SEC Persuaded a Court to Accept Its Prior Factual Theory, Creating the Perception That a Court Was Misled.</u>

By settling its case against Hunter, the SEC convinced a court to accept its prior factual theory. To judicially accept a prior position, a court need not have actually "ruled upon the truth of the plaintiff's claim." *Rissetto*, 94 F.3d at 604. Rather, the factor is satisfied when a party asserted the inconsistent position in a prior lawsuit and reached a favorable settlement. *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134 (9th Cir. 2012); *Rissetto*, 94 F.3d at 604–605. Parties "who triumph by inducing their opponents to surrender have 'prevailed' as surely as persons who induce the judge" to rule in their favor. *Rissetto*, 94 F.3d at 605. "This is because it's the coercive power of the court—the judgment it might render if the case is litigated to its conclusion—that's the driving force behind such settlements." *Baughman*, 685 F.3d at 1134.

For instance, in *Baughman*, the Ninth Circuit judicially estopped a plaintiff from asserting a factual position inconsistent with the position she had taken in previous cases where she obtained favorable settlements. 685 F.3d at 1134. The plaintiff in *Baughman* filed complaints against three defendants, claiming that she could not access their respective facilities while using a wheelchair, on which she relied for her mobility. *Baughman v. Walt Disney World Co.*, 691 F. Supp. 2d 1092, 1096 (C.D. Cal. 2010). The plaintiff obtained favorable settlements in these lawsuits. *Baughman*, 685 F.3d at 1134. All three defendants agreed to modify their properties and two defendants paid monetary compensation. *Id*. After obtaining these settlements, the plaintiff sued Disneyland, alleging that Disneyland's policy prohibiting the use of Segways violated the Americans with Disabilities Act because she never used, and could not use, a wheelchair, an assistive device Disneyland allowed. *Id*. The Ninth Circuit ruled that the second judicial estoppel factor was satisfied because the plaintiff "derived a benefit from an earlier lawsuit where material inconsistent representations were made on her behalf." *Id.*

There is no dispute that the court accepted the SEC's position in the Hunter case. In *Baughman*, the Ninth Circuit found that out of court settlements were sufficient to satisfy this factor. In the Hunter case, the SEC convinced the court to enter a consent judgment. SUF Nos. 31 & 40. The court relied on the SEC's factual allegations in entering the Consent Judgment, which conferred substantial benefits on the SEC. The SEC obtained *all* the relief asked for in its complaint: (1) a permanent injunction restraining Hunter from violating the securities laws referenced in the complaint; (2) disgorgement of $630,000; and (3) an injunction prohibiting Hunter from serving as an officer or director of any entity that issued registered securities. SUF No. 32; Request for Judicial Notice ("RJN") Ex. H at 3–6. Furthermore, Hunter agreed that he would not contest the SEC's allegations against him. SUF No. 34. The SEC also secured a legally binding commitment from Hunter to be interviewed by the SEC at any time and at any place. SUF No. 36. The SEC thus "derived a benefit

from an earlier lawsuit where material inconsistent representations were made on [its] behalf." *Baughman*, 685 F.3d at 1134. As such, the SEC convinced the court to accept its previous factual theory. *See id*.; *Rissetto*, 94 F.3d at 604–605.

Further, if the SEC is allowed to assert its contradictory factual theory here, it would create the perception that either the court that entered Hunter's consent judgment or this Court must have been misled. The formation of a bribery scheme is the central factual allegation of the SEC's case. The SEC's theory as to how the bribery scheme formed is not "peripheral or immaterial" to the SEC's claims, but essential to them. *Baughman*, 685 F.3d at 1134. The second judicial estoppel factor is therefore satisfied.

3. Allowing the SEC to Change Its Factual Theory Would Give the SEC an Unfair Advantage in This Litigation and Impose an Unfair Detriment.

As noted above, the third factor of judicial estoppel is satisfied when not applying the doctrine would allow a party to derive an unfair advantage ***or*** impose an unfair detriment on the opposing party. A party gains an unfair advantage over its opponent where the party's case "could be significantly stronger" if allowed to assert the inconsistent position. *Baughman*, 685 F.3d at 1134. In *Baughman*, the Ninth Circuit concluded that allowing the plaintiff to argue that she could not use a wheelchair would unfairly strengthen her current case because Disneyland allowed wheelchairs on its premises; thus, her disability discrimination claim that she was denied a "reasonable modification" would be stronger if she could not use a wheelchair. *See id*. at 1132–34.

The SEC unquestionably would receive an unfair advantage if allowed to assert one factual theory to prevail against Hunter and then pursue a contradictory factual theory against Pulier. The SEC won its case against Hunter by arguing that Pulier allegedly offered bribes to increase the earnout payment at an in-person meeting in September 2013. As shown above, this argument suffers from the flaw that there was no earnout in September 2013. If judicial estoppel is not applied, the SEC will be

allowed to obtain a win against Hunter with a theory against which Pulier could mount a strong defense, but then be allowed to pursue its case against Pulier without being saddled with its prior position. *See Cont'l Illinois Corp. v. Comm'r*, 998 F.2d 513, 518 (7th Cir. 1993) ("A party can argue inconsistent positions in the alternative, but once it has sold one to the court it cannot turn around and repudiate it in order to have a second victory.") The SEC's case against Pulier would be significantly stronger if it were permitted to drop its prior theory—a theory with serious shortcomings—to assert a new factual theory of the formation of the bribery scheme. Not applying judicial estoppel would allow the SEC to paper over a critical defect to avoid Pulier's compelling defense to the factual theory of the bribery scheme the SEC asserted in the Hunter case.

Additionally, the SEC received significant benefits from using Hunter's statements in his interview to win the case against him. In his consent, Hunter agreed to be interviewed by the SEC at any time and place, agreed to accept service of SEC subpoenas to provide testimony and documents in other SEC cases, and agreed to waive jurisdictional challenges to subpoenas. Indeed, Hunter has met with the SEC multiple times since this litigation started, but has refused to meet with Pulier's counsel. SUF No. 92. Now, the SEC seeks to retain the benefits of Hunter's cooperation, while avoiding the factual narrative that allowed it to win its case against Hunter and obtain those benefits. The SEC would receive an unfair advantage if allowed to engage in such conduct.

Moreover, allowing the SEC to change factual theories would impose an unfair detriment on Pulier. Pulier's counsel made a presentation to the SEC outlining his defenses to the factual theory the SEC successfully asserted against Hunter. SUF Nos. 75–78. Pulier could have waited to expose the difficulties in Hunter's story until trial but chose to be forthcoming with the SEC in the hopes of resolving this matter. In response, the SEC changed factual theories after discovering that Pulier knew of the flaws in the factual theory it alleged against Hunter. It is fundamentally unfair and

imposes an unfair detriment on Pulier for the SEC to use Pulier's presentation against him in this way.

4. Judicial Estoppel Is Particularly Appropriate Here, Where the SEC Knew of the Problems with Hunter's Story Before Suing Hunter.

Judicial estoppel is especially appropriate because the SEC's change of position is not an accident. Courts apply judicial estoppel when a party knew of sufficient material facts before advancing its initial position. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 785 (9th Cir. 2001); *Gagne v. Zodiac Mar. Agencies, Ltd.*, 274 F. Supp. 2d 1144, 1149 (S.D. Cal. 2003).

This is what happened here. Before the SEC filed its complaint against Hunter and entered into a consent agreement with him, it had documentary evidence and had conducted interviews that established Hunter could not have been offered a bribe to inflate the earnout in September 2013. As noted above, the SEC possessed the ServiceMesh acquisition negotiation documents, which showed that there was not an earnout in September 2013. The SEC possessed the September 9, 2013 term sheet and October 4, 2013 draft merger agreement, which proposed a fixed price deal and contained no earnout. SUF Nos. 43–44, 46. The SEC also received the October 16, 2013 term sheet, which contained an earnout provision for the first time, and the October 21, 2013 draft acquisition agreement incorporating the earnout. SUF Nos. 43, 47–48. These documents demonstrate that the earnout was not part of the proposed acquisition until October 2013. Further, the SEC attorney who signed the complaint against Hunter was present at four interviews of witnesses who explained that there was no earnout in September. SUF No. 70. This SEC attorney also received two emails from CSC twenty-two days before filing the Hunter complaint that demonstrated that the earnout was added to the deal in October. SUF No. 72. Because the SEC was aware that no earnout existed in September 2013, it was aware it was counterfactual to allege that (1) Hunter learned of the earnout in September 2013; and (2) that Pulier offered bribes to inflate the earnout at a later September in-

person meeting in Santa Monica with Hunter and Waldron.

It is implausible for the SEC to claim that the Hunter complaint included the wrong month or location due to a clerical error. The SEC prepared at least 13 drafts of the Hunter complaint before filing it and the FD-302 of Hunter's interview reveals that Hunter discussed a September meeting and mentioned the word earnout ***57 times***. *See* SUF No. 71; Rapore Decl. Ex. 8 at 15. Moreover, under his Consent, Hunter is still contractually bound to assist with the SEC's litigation against Pulier, including sitting for interviews whenever and wherever the SEC wants. SUF No. 36. And the SEC is still relying on Hunter's December 2015 interview that formed the basis of the allegations in the Hunter complaint. In a recent pleading in this case, the SEC cited the FD-302 summary of the December 2015 interview on which the SEC based its compliant against Hunter. SUF No. 93.

In spite of this information, the SEC filed a complaint based on Hunter's story, and obtained Hunter's consent to a final judgment against him. The SEC took the most straightforward route to obtaining Hunter's consent: drafting a complaint based on Hunter's statements in a formal FBI and SEC interview. The SEC was aware that Hunter agreed to plead to the criminal charges the USAO was about to file. SUF No. 33. Furthermore, the USAO planned to use Hunter as a cooperator in a future criminal proceeding against Pulier. By adopting Hunter's story in its complaint, the SEC avoided filing a public document contradicting the USAO's key cooperator, the only witness claiming that Pulier offered a bribe.

When the SEC and the USAO brought proceedings against Pulier, the SEC was aware that Pulier would challenge the factual theory in the Hunter complaint. It therefore deleted all references to the September meeting in its Pulier complaint and only made a vague, single-sentence allegation that "[i]n late 2013, Pulier offered to pay bribes to Hunter . . . ." Rapore Decl. Ex. 1 at 6. Since the criminal case would proceed first, the SEC could likely ride the coattails of a criminal conviction and obtain a victory without providing any specific information about how the bribery

scheme was formed. Indeed, the SEC agreed to a request by the USAO to stay this case until the criminal case concluded. *See* SUF No. 94.

When the USAO dismissed the indictment and the SEC finally had to explain specifically how the bribery scheme formed, the SEC switched its position. Gone was the allegation that Hunter was offered a bribe to inflate the (nonexistent) earnout in September. Now the SEC contends that the bribes were offered by phone in October 2013, the month the earnout became part of the ServiceMesh acquisition.

Such strategic changes of position cannot be dismissed as simple mistakes. Instead, the SEC knew of the shortcomings of the factual position alleged in the Hunter complaint, but decided to proceed with the allegations anyway. The SEC's choice served its objective for purposes of the Hunter lawsuit—Hunter consented to a judgment against him consistent with his statements and plea agreement. But the SEC must live with the consequences of that decision and should be precluded from advancing a contradictory theory here.

## **CONCLUSION**

Pulier respectfully requests that the Court grant his motion for partial summary judgment and judicially estop the SEC from pursuing the factual theory concerning the formation of the bribery scheme it is advancing in this litigation.

DATED: April 28, 2020 Kirkland & Ellis LLP

By: */s/ James Rapore*
James Rapore

*Attorneys for Defendant Eric Pulier*