Mark C. Holscher (SBN 139582)
mark.holscher@kirkland.com
Jeff Sinek (SBN 135508)
jeff.sinek@kirkland.com
James Rapore (SBN 278925)
james.rapore@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

David Klein (SBN 273925)
david.klein@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900

*Attorneys for Defendant Eric Pulier*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ERIC PULIER,

Defendant.

**CASE NO. 17-CV-07124-PSG-RAO**

**DEFENDANT'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW**

Hearing Date: June 22, 2020
Time: 1:30 p.m.
Courtroom: 6A

Defendant Eric Pulier submits his Statement of Uncontroverted Material Facts and Conclusions of Law pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56–1 of the Local Rules of the Central District of California in support of his Motion for Partial Summary Judgment.

## UNCONTROVERTED MATERIAL FACTS

| Uncontroverted Fact | Evidence |
|---|---|
| 1. In 2013 CSC sought to acquire ServiceMesh, a company that provides enterprise cloud–based applications and platforms. | Declaration of James Rapore ("Rapore Decl.") Ex. 1 at 5.[1] |
| 2. On September 9, 2013, CSC sent ServiceMesh a term sheet proposing to acquire ServiceMesh for a fixed price of $335 million. | Rapore Decl. Ex. 2 at 2–4; Declaration of Eric Pulier ("Pulier Decl.") ¶ 5. |
| 3. The initial term sheet did not contain an earnout clause. | Rapore Decl. Ex. 2 at 4. |
| 4. On October 4, 2013, CSC sent ServiceMesh a draft of a merger agreement. | Rapore Decl. Ex. 3 at 2–3; Pulier Decl. ¶ 6. |
| 5. The October 4, 2013 merger agreement proposed a sale for a fixed price of $335 million. | Rapore Decl. Ex. 3 at 9–10. |
| 6. On October 16, 2013, CSC provided ServiceMesh with a new term sheet that for the first time added an earnout provision to the deal terms. | Rapore Decl. Ex. 4 at 2–3, 6–9; Pulier Decl. ¶ 7. |

[1] Citations to pages of exhibits refer to the page numbers at the bottom center of each page, which were added prior to filing.

| | | |
|---|---|---|
| 7. | On October 21, 2013, ServiceMesh received an updated agreement, now styled as an Equity Purchase Agreement ("EPA"), incorporating an earnout provision. | Rapore Decl. Ex. 5 at 2–3, 9–13; Pulier Decl. ¶ 8. |
| 8. | On October 29, 2013, CSC and ServiceMesh signed the EPA, which contained an earnout provision. | Rapore Decl. Ex. 6 at 2, 8–14; Pulier Decl. ¶ 9. |
| 9. | Under the terms of the final earnout provision, ServiceMesh shareholders would receive a multiple of approximately $10 for every dollar of revenue over $20 million that ServiceMesh generated from January 1, 2013 to January 31, 2014. | Rapore Decl. Ex. 7 at 6; Pulier Decl. ¶ 10. |
| 10. | Hunter drafted a 28–paragraph statement explaining that the Ace payments were not bribes but advances on legitimate consulting work he was to perform for Ace. | Rapore Decl. Ex. 8 at 7–8, Ex. 9 at 3. |
| 11. | In 2015, the SEC and the USAO commenced an investigation into allegations that Pulier paid bribes to Hunter and Waldron to increase the earnout payment CSC made to ServiceMesh shareholders. | Rapore Decl. Ex. 10 at 2, 6, Ex. 11 at 2, Ex. 16 at 2. |
| 12. | On December 16, 2015, the USAO, the FBI and the SEC interviewed Hunter in Australia. | Rapore Decl. Ex. 12 at 3, Ex. 8 at 12. |
| 13. | SEC attorney Catherine Brilliant represented the SEC at this interview. | Rapore Decl. Ex. 12 at 3. |

| | | |
|---|---|---|
| 14. | Hunter told the SEC at this interview that before CSC acquired ServiceMesh, he met with CBA's Chief Information Officer, Michael Harte, in Harte's office in Australia. | Rapore Decl. Ex. 12 at 4. |
| 15. | Hunter told the SEC at this interview that Harte informed Hunter at this meeting that the acquisition included an "earn–out incentive," whereby ServiceMesh shareholders would receive more compensation for additional revenue ServiceMesh generated. | Rapore Decl. Ex. 12 at 4. |
| 16. | Hunter told the SEC at this interview that Harte informed him that Pulier "devised a formula" to pay Hunter and Harte for assisting ServiceMesh in generating additional revenue and increasing the earnout. | Rapore Decl. Ex. 12 at 4. |
| 17. | Hunter told the SEC at this interview that Harte drew a chart detailing how such a payout could work. | Rapore Decl. Ex. 12 at 4. |
| 18. | Hunter also claimed at this interview that "[s]hortly after the meeting with Harte," Hunter and Waldron traveled to Santa Monica to meet with Pulier. | Rapore Decl. Ex. 12 at 4. |
| 19. | Hunter told the SEC at this interview that at this meeting, "Pulier discussed the payout Hunter, Waldron and Harte could receive from Pulier" for helping ServiceMesh increase the earnout. | Rapore Decl. Ex. 12 at 4. |

| | | |
|---|---|---|
| 20. | Hunter claimed at this interview that after "leaving the meeting, Hunter was under the impression that Hunter, Waldron and Harte would receive the same . . . payout from Pulier for their assistance with helping [ServiceMesh] achieve the 'earn–out'." | Rapore Decl. Ex. 12 at 4–5. |
| 21. | On September 27, 2016, the SEC filed a complaint against Hunter. | Request for Judicial Notice ("RJN") Ex. C at 2. |
| 22. | The SEC's complaint against Hunter adopted his statements at his interview. | Rapore Decl. Ex. 12 at 4–5, Ex. 13 at 4–5; RJN Ex. C at 6. |
| 23. | The SEC alleged that "Hunter learned in September 2013 that CSC planned to acquire [ServiceMesh], and understood that the terms would include an earn–out clause pursuant to which [ServiceMesh] shareholders could receive an additional payment based on [ServiceMesh's] software revenue generated through the end of January 2014." | RJN Ex. C at 6. |
| 24. | The complaint further alleged that "[l]ater in September 2013, Hunter traveled with another CBA executive to [ServiceMesh's] Santa Monica office for in–person meetings." | RJN Ex. C at 6. |

| | | |
|---|---|---|
| 25. | The complaint alleged that, "During one of the meetings attended by Hunter, [Pulier], and others, [Pulier] offered to pay a kickback to Hunter and two of his CBA colleagues in return for helping [ServiceMesh] shareholders maximize their Earn–out Payment from CSC." | RJN Ex. C at 6. |
| 26. | Finally, the complaint alleged that "Hunter and at least one other CBA employee agreed to help [Pulier] generate revenue for [ServiceMesh] through sales to CBA in exchange for the offered kickback." | RJN Ex. C at 6. |
| 27. | On September 27, 2016, the USAO filed a criminal information against Hunter. | RJN Ex. D at 2. |
| 28. | On September 29, 2016, the USAO filed a plea agreement that Hunter signed. | RJN Ex. E at 4, 6; Rapore Decl. Ex. 8 at 17–18, Ex. 14 at 4–6. |
| 29. | In the plea agreement, Hunter admitted to the same allegations concerning the formation of a bribery scheme to increase the earnout at the September 2013 meeting in Santa Monica, as the SEC alleged in its complaint against Hunter. | *Compare* RJN Ex. C at 6 *with* Rapore Decl. Ex. E at 4, 8–10 *and* Ex. 14 at 4, 8–10. |
| 30. | The SEC agreed not to file its complaint, and the USAO agreed not to file its information, on September 26, 2016 because a "presidential debate" would "drown out" news coverage. | Rapore Decl. Ex. 15 at 2. |

| | | |
|---|---|---|
| 31. | On September 27, 2016, the SEC entered into a Consent for Final Judgment with Hunter. | RJN Ex. G at 2. |
| 32. | In the Consent, Hunter consented to the SEC's requested relief, including disgorgement of $630,000. | RJN Ex. G at 3–4. |
| 33. | In the Consent, Hunter agreed to acknowledge his written plea agreement admitting to conduct alleged in the complaint. | RJN Ex. G at 2–3. |
| 34. | In the Consent, Hunter agreed not to contest the factual allegations in the SEC's complaint. | RJN Ex. G at 5. |
| 35. | In the Consent, Hunter agreed not take "any action or make or permit to be made any public statement denying" the allegations in the complaint, or "creating the impression" the complaint lacked a factual basis. | RJN Ex. G at 5. |
| 36. | In the Consent, Hunter agreed to be interviewed by the SEC for an unlimited period of time, at the time and place of the SEC's choosing. | RJN Ex. G at 6. |
| 37. | In the Consent, Hunter agreed to accept service of notices and subpoenas from the SEC and waive the territorial limits of Federal Rule of Civil Procedure 45. | RJN Ex. G at 6. |

| | |
|---|---|
| 38. In the Consent, Hunter agreed to consent to personal jurisdiction in any U.S. District Court. | RJN Ex. G at 7. |
| 39. In exchange for Hunter's Consent, the SEC agreed to resolve the claims it had asserted against Hunter. | RJN Ex. G at 4. |
| 40. The district court accepted Hunter's Consent. | RJN Ex. H at 2, 6. |
| 41. The district court then entered a final judgment against Hunter granting the SEC its requested relief. | RJN Ex. H at 3–6. |
| 42. As part of its investigation, the SEC received 15 volumes of documents from CSC in 2015. | Rapore Decl. Ex. 16 at 2–10, Ex. 17 at 3, 5. |
| 43. In total, as of September 5, 2016, CSC had produced a bates number range of documents of CSC00000001 to CSC00958635. | Rapore Decl. Ex. 16 at 2–10, Ex. 17 at 3– 5, Ex. 27 at 3. |
| 44. Included in these productions was the September 9, 2013 term sheet proposing to acquire ServiceMesh for a fixed price of $335 million. | Rapore Decl. Ex. 2 at 4 (beginning with bates number CSC00030598), Ex. 16 at 2–10, 5–9, Ex. 17 at 3–5; Pulier Decl. ¶ 5. |
| 45. Included in these productions was a September 25, 2013 draft email to be sent from ServiceMesh to CSC summarizing the compensation for the deal as including a fixed price of $335 million. | Rapore Decl. Ex. 19 at 2 (bearing bates number CSC00078159), Ex. 16 at 2–10, Ex. 17 at 3–5; Pulier Decl. ¶ 11. |

| | | |
|---|---|---|
| 46. | Included in these productions was the October 4, 2013 draft EPA proposing a sale for a fixed price of $335 million. | Rapore Decl. Ex. 3 at 2–3, 9–10 (beginning with bates number CSC00027878), Ex. 16 at 2–10, Ex. 17 at 3–5; Pulier Decl. ¶ 6. |
| 47. | Included in these productions was the October 16, 2013 term sheet containing an earnout provision. | Rapore Decl. Ex. 4 at 3, 6–9 (beginning with bates number CSC000910922), Ex. 16 at 2–10, Ex. 17 at 3–5; Pulier Decl. ¶ 7. |
| 48. | Included in these productions was the October 21, 2013 EPA containing an earnout provision. | Rapore Decl. Ex. 5 at 3, 9–13 (beginning with bates number CSC00030338), Ex. 16 at 2–10, Ex. 17 at 3–5; Pulier Decl. ¶ 8. |
| 49. | Included in these productions was the signed and executed October 29, 2013 EPA containing an earnout provision. | Rapore Decl. Ex. 6 at 2, 9–14 (beginning with bates number CSC00000001), Ex. 16 at 2–10, Ex. 17 at 3–5; Pulier Decl. ¶ 9. |
| 50. | The SEC interviewed CSC's chief financial officer Paul Saleh on July 14, 2016. | Rapore Decl. Ex. 20 at 2, Ex. 25 at 9. |
| 51. | During the interview, Saleh was shown the September 2013 term sheet for the ServiceMesh transaction, which contained no earnout. | Rapore Decl. Ex. 20 at 4. |
| 52. | Before the Saleh interview, AUSA Stephen Cazares emailed SEC attorney Catherine Brilliant the exhibits he "plan[ned] to show [Nelson] Eng." | Rapore Decl. Ex. 18 at 2. |
| 53. | Attached as exhibit 3 to this email is a copy of the September 2013 term sheet. | Rapore Decl. Ex. 18 at 3–5. |

| | | |
|---|---|---|
| 54. | During Saleh's interview, AUSA Cazares showed him exhibit 3 from the Eng interview. | Rapore Decl. Ex. 22 at 3 (showing that Exhibit 3 to Nelson Eng's interview was the September 9, 2013 term sheet), Ex. 20 at 4, Ex. 25 at 9. |
| 55. | Saleh confirmed that the earnout was added "later on." | Rapore Decl. Ex. 20 at 4. |
| 56. | On October 8, 2015, the SEC interviewed Jeff Drake, an Executive Vice President of ServiceMesh who was a primary deal negotiator for ServiceMesh. | Rapore Decl. Ex. 21 at 2, Ex. 25 at 4–5. |
| 57. | Drake stated that the September 2013 term sheet did not involve an earnout, a provision added after CSC performed a substantial portion of its due diligence on ServiceMesh. | Rapore Decl. Ex. 21 at 3. |
| 58. | Drake told the SEC that "[t]he initial offer was for $335 million all cash" and that "[a]s diligence progressed, [ServiceMesh] revenue was not coming together as the pipeline projected. As a result, CSC began to consider an earnout." | Rapore Decl. Ex. 21 at 3. |
| 59. | The SEC interviewed CSC employee Nelson Eng, a primary deal negotiator for CSC, on November 12, 2015. | Rapore Decl. Ex. 22 at 2, Ex. 25 at 7. |
| 60. | During this interview, Eng was shown a copy of the September 2013 term sheet that and confirmed it contained no earnout. | Rapore Decl. Ex. 18 at 2–5, Ex. 22 at 3. |

| | | |
|---|---|---|
| 61. | Eng told the SEC that after the September 2013 term sheet was created, he "spent a lot of time at the Fairmont Hotel in Santa Monica, conducting shuttle diplomacy between CSC's deal committee and [ServiceMesh's] management," and evaluating ServiceMesh's "revenue pipeline." | Rapore Decl. Ex. 22 at 4. |
| 62. | Eng informed the SEC that following CSC's investigation, "CSC management had legitimate questions about which deals in the pipeline would close." | Rapore Decl. Ex. 22 at 4. |
| 63. | Eng also told the SEC during this interview that after walking away from negotiations and returning to the east coast, Eng and CSC's investment bankers crafted an earnout provision. | Rapore Decl. Ex. 22 at 4–5. |
| 64. | Eng also told the SEC during this interview that CSC's deal committee initially rejected the earnout but eventually approved it. | Rapore Decl. Ex. 22 at 5. |
| 65. | Finally, Eng told the SEC during his interview that after further negotiations, ServiceMesh agreed to the earnout. | Rapore Decl. Ex. 22 at 5. |
| 66. | Before Eng's interview, SEC attorney Catherine Brilliant was emailed a copy of the October 16, 2013 term sheet in which CSC added an earnout to the deal terms. | Rapore Decl. Ex. 23 at 2, 9–13. |

| | | |
|---|---|---|
| 67. | The SEC interviewed ServiceMesh CFO Teymour Boutros–Ghali on July 13, 2016. | Rapore Decl. Ex. 24 at 2, Ex. 25 at 8. |
| 68. | During this interview, Boutros–Ghali stated that the initial September 2013 term sheet was an “all cash” deal. | Rapore Decl. Ex. 24 at 3–4. |
| 69. | Boutros–Ghali also explained to the SEC during his interview that CSC subsequently added an earnout at a later date “when CSC became concerned about [ServiceMesh’s] sales forecasts.” | Rapore Decl. Ex. 24 at 4. |
| 70. | The SEC attorney who signed the Hunter complaint, Catherine Brilliant, attended the interviews of Saleh, Drake, Eng and Boutros–Ghali. | Rapore Decl. Ex. 20 at 2, Ex. 21 at 2, Ex. 22 at 2, Ex. 24 at 2. |
| 71. | Ms. Brilliant prepared at least 13 versions of the Hunter complaint before filing it on September 27, 2016. | Rapore Decl. Ex. 26 at 2. |
| 72. | 22 days before filing the Hunter complaint, counsel for CSC emailed Ms. Brilliant two internal ServiceMesh emails dated October 4, 2013 | Rapore Decl. Ex. 27 at 2–4. |
| 73. | In these emails, Jeff Drake of ServiceMesh explained that while the current deal was for a fixed price of “$335m,” he believed CSC might propose a structure where ServiceMesh would only get the full amount if it achieved certain “metrics.” | Rapore Decl. Ex. 27 at 3. |

| | | |
|---|---|---|
| 74. | After speaking with CSC the same day, Drake confirmed that CSC's "[n]ext step" was to find an alternative deal structure with greater "flexibility" on how to distribute the purchase price. | Rapore Decl. Ex. 27 at 4. |
| 75. | On November 3, 2016, Pulier's counsel made a presentation to the SEC detailing why the SEC should not bring an enforcement action against Pulier. | Holscher Decl. ¶ 2; Rapore Decl. Ex. 25 at 10. |
| 76. | Pulier's counsel argued that the SEC's theory of how the bribery scheme formed, as alleged in the Hunter complaint, was fundamentally flawed. | Holscher Decl. ¶ 3. |
| 77. | Pulier's counsel told the SEC that it was impossible for Hunter to have learned that the deal contained an earnout in September 2013 and for Pulier to have offered bribes to inflate the earnout at a September 2013 meeting in Santa Monica because there was no earnout in September 2013. | Holscher Decl. ¶ 4; Rapore Decl. Ex. 25 at 10. |
| 78. | Pulier's counsel referenced documents the SEC possessed before it filed the Hunter complaint—to show that the concept of an earnout did not exist in September. | Holscher Decl. ¶ 4; Rapore Decl. Ex. 25 at 10. |

| | | |
|---|---|---|
| 79. | At the time of the presentation, Pulier's counsel was unaware the SEC interviewed multiple witnesses who had already confirmed the earnout did not exist in September. | Holscher Decl. ¶ 6. |
| 80. | On September 27, 2017 the SEC filed suit against Pulier. | Rapore Decl. Ex. 1 at 2. |
| 81. | Each cause of action in the complaint against Pulier was based on the same alleged bribery scheme discussed in the Hunter complaint. | *Compare* Rapore Decl. Ex. 1 at 3, 6, 10–15 *with* RJN Ex. C at 6, 10–11. |
| 82. | In its complaint against Pulier, the SEC removed any reference to a September meeting in Santa Monica, any agreement being reached at this meeting to inflate the earnout, or Hunter's awareness of the earnout before this meeting. | *See generally* Rapore Decl. Ex. 1. |
| 83. | The SEC alleged that Pulier offered to pay bribes to Hunter and other CBA executives in "late 2013." | Rapore Decl. Ex. 1 at 6. |
| 84. | The USAO filed an indictment against Pulier on September 27, 2017. | Rapore Decl. Ex. 32 at 3. |
| 85. | The USAO eventually dismissed its indictment with prejudice "in the interests of justice." | RJN Ex. A at 2, 4, Ex. B at 3. |

| | | |
|---|---|---|
| 86. | On July 18, 2019 Pulier propounded his first set of interrogatories asking how the alleged bribery scheme was formed. | Rapore Decl. Ex. 28 at 3. |
| 87. | On September 19, 2019, in response to an interrogatory, the SEC acknowledged that the initial September 2013 term sheet contained no earnout and that "the terms of the deal were modified to . . . include an earnout" later "[a]s CSC conducted its due diligence." | Rapore Decl. Ex. 28 at 11–12. |
| 88. | The SEC claims that on October 21, 2013, "Pulier received a revised draft of the equity purchase agreement, which included the earnout provision." | Rapore Decl. Ex. 28 at 12. |
| 89. | The SEC also contends that "[a]t or around the time the earnout provision became part of the transaction . . . Pulier offered to compensate Mr. Hunter, Jon Waldron, and Michael Harte." | Rapore Decl. Ex. 28 at 10. |
| 90. | The SEC's response to Pulier's first interrogatory makes no specific mention of the September 2013 in–person meeting the SEC alleged in its case against Hunter. | Rapore Decl. Ex. 28 at 9–12. |
| 91. | The SEC contends in this case that "[a]round the time that Defendant Pulier received a revised draft of the equity purchase agreement with the earnout provision," Pulier had a series of calls with alleged bribery recipients. | Rapore Decl. Ex. 28 at 12. |

| | | |
|---|---|---|
| 92. | Hunter has met with the SEC multiple times since this litigation started, but has refused to meet with Pulier's counsel once. | Rapore Decl. Ex. 8 at 25–26. |
| 93. | In a recent pleading in this case, the SEC cited in its factual narrative the summary of the December 2015 interview on which the SEC based its complaint against Hunter. | Rapore Decl. Ex. 30 at 3, 5. |
| 94. | The SEC agreed to a request by the USAO to stay this case until the criminal case concluded. | Rapore Decl. Ex. 31 at 2–3, Ex. 32 at 3. |

| CONCLUSIONS OF LAW | |
|---|---|
| 1. | The factual theory concerning the formation of an alleged bribery scheme the SEC previously advanced against Keith Hunter in its complaint in the matter captioned *Securities and Exchange Commission v. Keith Hunter*, Central District of California Case No. 16–cv–7246, is clearly inconsistent with the SEC's factual theory in this litigation concerning the formation of the same bribery scheme. |
| 2. | The court in the *Hunter* case accepted the SEC's earlier factual theory when it accepted Hunter's Consent to Final Judgment and entered final judgment against him and in favor of the SEC. |
| 3. | The SEC would gain an unfair advantage or impose an unfair detriment if allowed to pursue its factual theory concerning the formation of the alleged bribery scheme it is advancing in this litigation. |
| 4. | The SEC's factual theory in this litigation concerning the formation of the bribery scheme is not the result of mistake, inadvertence or the discovery of new facts. |

DATED: April 28, 2020 Kirkland & Ellis LLP

By: */s/ James Rapore*
James Rapore

*Attorneys for Defendant Eric Pulier*